**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AGFORM TECHNOLOGIES LIMITED, AGFORM LIMITED, AGFORM LLC, AND DELSYS TECHNOLOGY LIMITED, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| CRODA INTERNATIONAL PLC, CRODA EUROPE LIMITED, AND CRODA INC., | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Agform Technologies Limited, Agform Limited, Agform LLC, and Delsys Technology Limited (together, "Agform"), file this Complaint against Defendants Croda International Plc ("Croda International"), Croda Europe Limited ("Croda Europe"), Croda Inc. ("Croda U.S.," and together with Croda International and Croda Europe, "Croda") in the above-entitled action and state as follows:

## INTRODUCTION

1.    Agform is a small company innovating next-generation agrochemical solutions that protect the environment.  Croda is a global chemical giant.  Their paths entwined when Croda expressed interested in Agform's new technology, Envelop.  Envelop is a microplastic-free, biodegradable platform for safely and effectively delivering active ingredients to crops.  Croda received access to Agform's Envelop trade secrets by promising to partner with Agform and assuring that Croda would keep Agform's trade secrets safe.  But, on information and belief, these promises and assurances were lies: with Agform's trade secrets in hand, Croda did not buy, or license Envelop but instead stole it.  Croda developed its own knock-off and now refuses to pay for what it stole, leaving Agform with no choice but to sue to stop Croda's theft from continuing.

2.     Croda's theft began when Croda saw Agform's LinkedIn marketing for its new Envelop technology and then contacted Agform to learn more. Croda's solicitation seemed innocuous and inviting. After all, Croda is large global company, with billions in sales. Agform, a small research-focused company, hoped Croda's outreach could help it license and commercialize Envelop.

3.     Enticing Agform with visions of worldwide licensing opportunities and promises of scientific knowledge and test results that Croda could provide through its wealth of worldwide laboratories, Croda requested physical samples of Envelop and its raw materials. Croda also solicited Agform's sensitive product manual, which explains how to make Envelop. And Croda requested Agform's strategies for how to market and use Envelop, including the identity and contact information for businesses who could develop and commercialize the product. Croda obtained all these trade secrets subject to an obligation to keep the information confidential and not to use it for its own benefit.

4.     Despite all its resources, Croda did not deliver the test results it promised. Croda instead strung Agform along with assurances of forthcoming test results and plans for supposed next steps. Those promises, it turned out, were empty and designed only to lure Agform into sharing more information about its novel technology.

5.     Agform is informed and believes that Croda was leveraging samples of Agform's product and Agform's other trade secrets about Envelop so that Croda could test and develop similar technology. On information and belief, Croda sought Brazilian regulatory permits that could allow it to carry out the field testing necessary for commercializing the technology. Around the same time, three of Agform's potential customers and partners for Envelop abruptly ceased their business discussions with Agform. The timing coincides with the growing season for

2

soybeans in Brazil—the location and key crop to be treated using the Envelop formulation that Croda was supposedly testing.  On information and belief, and with Agform's trade secrets in hand, Croda exhibited field demonstrations to Agform's customers and partners, on soybeans in Brazil, of a rip-off Envelop technology.

6.      In short, Croda misappropriated Agform's trade secrets by developing a copycat Envelop formulation and sharing it with Agform's potential partners.  When confronted with the misappropriation evidence during a May 2025 phone call, Croda's general counsel responded: "So what?"  Apparently, Croda thought it was above the law and could do what it wanted with Agform's trade secrets.  Left with no options, Agform brings this suit to vindicate its rights.

## PARTIES

7.      Plaintiff Agform Technologies Limited is a British private limited company.

8.      Plaintiff Agform Limited is a British private limited company.

9.      Plaintiff Agform LLC is a Delaware corporation.

10.     Plaintiff Delsys Technologies Limited is a British private limited company.

11.     Defendant Croda International Plc ("Croda International") is a British public limited company.

12.     Defendant Croda Europe Limited ("Croda Europe") is a British private limited company.  Croda Europe is a wholly owned subsidiary of Croda International.

13.     Defendant Croda, Inc. ("Croda U.S.") is a Delaware corporation.  It has at least one manufacturing site in this District.  Croda U.S. is a wholly owned subsidiary of Croda International Plc.

RLF1 33264597v.1

**VENUE AND JURISDICTION**

14.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 for Agform's claim for misappropriation of trade secrets under 18 U.S.C. §§ 1836–39, *et seq*., the Defend Trade Secrets Act (the "DTSA"). The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claim for misappropriation of trade secrets under 6 Del. C. § 2001, *et seq.*, the Delaware Uniform Trade Secrets Act (the "DUTSA"), because this claim and the DTSA claim involve a common nucleus of operative facts.

15.     Venue is proper and this Court has personal jurisdiction as to Croda because a substantial portion of the events and omissions giving rise to this lawsuit occurred in this District. Croda U.S. is a corporation organized under the laws of Delaware. The events and omissions pleaded in this Complaint include actions of Greg Lindner, Croda's Technical Business Development Director for Global Crop Care, who resides in and who works for Croda in this District. Mr. Lindner induced Agform to share its trade secrets and explore having Croda test, develop, and license Agform's Envelop technology. From Delaware, Mr. Lindner performed key tasks relating to Croda's relationship with Agform and directed other Croda employees to do the same. Pursuant to his direction, Croda sought and received Agform's trade secrets regarding its technology, business, and strategies, as detailed below. Croda (a) misappropriated Agform's confidential and trade secret information by soliciting information during at least one video meeting which included Croda personnel in this District and (b) misappropriated Agform's confidential and trade secret information by disclosing it to potential Agform partners and customers, who do business in this District and some of whom are organized under Delaware law.

16.     In the alternative, this Court has personal jurisdiction over Croda International and Croda Europe for Agform's claim under the DTSA pursuant to Fed. R. Civ. P. 4(k)(2) because

Croda International and Croda Europe misappropriated Agform's trade secrets by disclosing them to potential Agform partners and customers, and those potential partners' and customers' personnel, across the United States. For example, "Partner A" is a Delaware company with its headquarters in Pennsylvania, and a key R&D center covering over 500 acres in Delaware; "Partner B" is an Iowa company with its corporate headquarters in Iowa, and a sales force servicing Delaware; and "Partner C" is an Arizona company with its headquarters in Arizona, and a sales force either located in or servicing Delaware.[1] Croda explored Envelop licensing opportunities in the United States. The Court also has pendent personal jurisdiction over the DUTSA against Croda International and Croda Europe since it arises from a common nucleus of operative facts as the DTSA claim. Venue is proper as to Croda International and Croda Europe pursuant to Rule 4(k)(2) and 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

### A. Agform And Its Trade Secrets.

17.     Agform develops technologies to balance the challenges of crop protection in feeding a growing population against the need to minimize environmental and human impact. Among its many developments is Envelop, a proprietary microplastic-free and biodegradable formulation platform designed for the encapsulation of volatile active ingredients applied to crops. Envelop enables stable, high-load formulations across a range of active ingredients, with unmatched compatibility, shelf life, and sprayability. Envelop aligns with current and emerging global microplastic regulations.

---

[1] To protect its potential partners and customers, Agform uses these pseudonyms when referring to them in this Complaint.

18.     As an example, Envelop can be used to deliver "Chemical X" to crops in a safe, biodegradable, and microplastic-free manner.[2]  Chemical X aids in the growth of soybeans.  When delivered through Envelop instead of traditional delivery agents, Chemical X's efficacy is higher, yet it results in less bleaching of surrounding crops, fewer environmental waste byproducts (including no microplastics and full biodegradability), and stronger UV resistance.

19.     Agform has spent over five years and seven figures in the research, development, and improvement of Envelop.  Its core team of researchers and chemists have performed the R&D necessary for a successful product:  materials, labor, regulatory compliance evaluation, and patent strategy.  Agform has collaborated with actual and potential customers, listened to feedback, and conducted expensive and expansive scientific research to improve this and other offerings.

20.     Agform has developed various technologies for Envelop, including modifications to its base formulations that optimize its use and efficacy with different active ingredients for different crops and use cases. This development had led to an adaptable agent for delivering actives ingredients.   Its flexible uses and novel formulations give Envelop high commercial value, especially when accompanied by Agform's go-to-market strategy that took years to develop.

21.     Agform's continued success depends on the intellectual property underlying Envelop, which Agform goes to great lengths to protect.  Among this intellectual property are trade secrets including numerous categories of proprietary know-how essential to Envelop's performance and competitive value, such as, and for example:

---

[2] To protect its trade secret in the identity of Chemical X, Agform uses this pseudonym when referring to it in this Complaint

RLF1 33264597v.1

- Selection and ratios of water-miscible and water-immiscible solvents used to solubilize specific agrochemical actives like clomazone and acetochlor in the presence of ethyl cellulose and a proprietary emulsifier;

- Formulation design rules for achieving spontaneous capsule formation on aqueous dilution and avoiding interfacial polymerization, which result in microcapsules in the 5–50 μm size range;

- Conditions and mixing protocols—including the order of addition, temperature, and shear profiles—used to dissolve the biodegradable polymer and incorporate the agrochemical without degradation;

- Selection and use of specific emulsifiers, such as ethoxylated propoxylated polyarylphenols (*e.g.*, Soprophor 796/P), which provide droplet stability and enable microcapsule wall formation on dilution;

- Techniques to optimize polymer viscosity, solvent molecular weight, and solvent biodegradability for consistent capsule morphology, field stability, and controlled release;

- Specific compositions of formulations tested, which demonstrate superior volatility suppression and crop safety compared to conventional capsule suspension (CS) formulations, along with combinations of Envelop and various active ingredients, the identities of which are themselves trade secrets;

- Performance data and physical property profiles of Envelop formulations under laboratory and field conditions, including volatility, phytotoxicity, and weed control efficacy, as well as physical product and samples;

- Selection of surfactant types, concentrations, and dispersion techniques used to control capsule size, integrity, volatility reduction, and active release rate;

- Data identifying which classes of active ingredients are compatible or incompatible with the Envelop delivery system, along with rationales (*e.g.*, solubility index, pKa shifts, instability flags)

- Interpretations and analysis aligning Envelop's design with evolving global microplastics legislation and guidance;

- Strategic plans for bringing Envelop to market, including Agform's valuation of Envelop, along with the identities and processes of strategic partners for supplying active ingredients, and the identities and preferences of customers for purchasing finished product, including contact information and plans for engaging with each; and

- The trial and error (both positive and negative) that Agform undertook to create these trade secrets, including the formula and mixing processes for Envelop and its use with various active ingredients.

All these trade secrets and confidential information described in this paragraph (collectively, the "Trade Secrets") are related to products or services, including Envelop that Agform uses in, or intends to use in, interstate or foreign commerce.

22.    Agform's Trade Secrets derive considerable value from not being publicly known outside of Agform.  They derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.  The secrecy of the Trade Secrets gives Agform a competitive advantage and contributes to how Agform's products and technology stand out from the competition.  For example, Agform's Envelop product, and the positive and

negative research and development efforts leading to its creation, allows for encapsulation of active ingredients without the use of microplastics. The public disclosure of this technological and R&D information or its use by competitors would allow those competitors to close the developmental gap and bring competitive products to market, potentially on an unfairly expedited timeline. Similarly, the secrecy of Agform's strategic plans and targets for commercializing Envelop—including by pairing it with specific active ingredients for use with specific partners and customers—gives Agform an edge against competitors who might try to target these same partners and customers. If these competitors had Agform's formulas and strategic plans, they might beat Agform to market, get to market more quickly, and/or tie up Agform's target partners and customers—cutting into Agform's large commercial advantage. Actions like these damage Agform's financial opportunity and reputation as a leader in this space, undermining the goodwill that Agform has created.

**B.  <u>Agform's Efforts To Protect Its Trade Secrets.</u>**

23.    Agform takes reasonable steps to protect its Trade Secrets and other confidential information from disclosure. These steps include procedures regarding employees, consultants, third parties, electronic protections, and physical security. One such step is to only disclose the Trade Secrets to employees and consultants on a need-to-know basis. And when Agform does disclose the Trade Secrets, it first requires employees and consultants who stand to gain access to sign a confidentiality agreement.

24.    Among other things, these agreements generally require employees and consultants with access to the Trade Secrets and other confidential information:

- to not disclose or use Trade Secrets without Agform's prior consent;

- to use Agform's Trade Secrets only for the benefit of Agform;

- to return all company property and Trade Secrets immediately upon termination of employment; and

- to assign any inventions or intellectual property developed in the course of their employment to Agform.

25.     Furthermore, Agform limits access to the Trade Secrets through actions and procedures designed to prevent any unauthorized use or disclosure.  For example, entry into Agform's facilities is controlled and limited using physical security devices (like locks) and digital access controls (like badges to swipe in).  Agform protects its IT systems with passwords and unique login credentials.  It monitors them with security personnel and software; once again, access is limited to only authorized individuals.  Agform also maintains other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software.

26.     Agform maintains policies that express the importance of confidentiality and prohibit its employees and consultants unauthorized actions regarding confidential information. Agform also trains its employees and consultants concerning the importance of maintaining confidentiality.

27.     When disclosing any Trade Secrets or other confidential information to third parties like customers, partners, or vendors—which Agform does only on a need-to-know basis—Agform generally requires executed non-disclosure agreements preventing any unauthorized use or disclosure, or at the very least only does so based on a clear understanding that the information it is disclosing will be kept confidential to the receiving party.

**C.  Croda Expresses Unsolicited Interest In Envelop.**

28.     After millions of dollars and many months of research and development, Agform posted a video on LinkedIn in late 2023 showing its Envelop technology at work.  The publicly

available video did not disclose any Trade Secrets, but it instead demonstrated the promise of Envelop by showcasing a typical use case to attract potential partners, customers, and investors.

29.    This video caught Croda's attention.  A Croda representative contacted Agform about **Envelop**, expressing interest in testing, developing, and obtaining licensing rights in Envelop.

30.    With an understanding that its technical and commercial information—including its Trade Secrets—would be kept confidential, Agform met with Croda representatives in December 2023.  Agform disclosed Trade Secrets relating to the Envelop formula, identities of key active ingredients to pair with it (including Chemical X), valuation information, and strategies for bringing Envelop to market for specific use cases.  On information and belief, Croda later disclosed these Trade Secrets to the Delaware-based Mr. Lindner.

31.    Agform obtained additional protections from Croda with respect to its Trade Secrets.  Because of confidentiality restrictions attendant to these additional protections, Agform cannot detail them in this public pleading but will do so at the appropriate time.  With those protections in place, and in reliance on them, Agform continued to engage with Croda regarding its interest in Envelop's viability and potential commercialized agricultural use.  Croda brought Mr. Lindner into these discussions about Envelop by January 2024.

32.    Throughout the early months of 2024, Croda continued to engage Agform in at least the following ways:

- *Meeting Including Croda's Delaware-based Mr. Lindner (January 11, 2024)*—At this meeting, Agform disclosed further Trade Secrets relating to Envelop, including in response to questions about biodegradability raised specifically by Mr. Lindner. Agform also shared information relating to active ingredients (including Chemical X),

valuation, and go-to-market strategies like what it shared at the December 2023 meeting—this time, with Mr. Lindner attending remotely, on information and belief, from his location in Delaware.  Croda also requested Agform provide information on the effects of specific ingredients in Envelop, as well as specific testing results regarding volatility, biodegradability, and robustness.

- *Requesting Envelop Samples (Beginning January 22, 2024)*—Claiming the need for samples as a proof-of-concept, Croda proposed using Envelop as the delivery agent for Chemical X.  With protections for its Trade Secrets in place and an understanding that its Trade Secrets would be kept confidential, Agform prepped samples to ship to Croda, who continued requesting technical information about Envelop.

- *Proposing a "Work Plan" to be Completed in Five Months (February 9, 2024)*— Croda's proposed Work Plan suggested using Envelop to encapsulate Chemical X.  It was to be completed in two stages.  Croda claimed the first stage should only take three months and contemplated basic testing, the results of which would be shared with Agform.  The second stage, Croda said, was to take only two months and contemplated further tests, again with Agform to receive the results.  Agform suggested that certain biological greenhouse tests be moved from stage two to stage one.  Croda included Mr. Lindner in the "proposed workgroup" for the Work Plan.

- *Arranging Shipment of Envelop Samples (February 2024)*—In furtherance of Croda's proposed Work Plan, Agform dispatched samples of Envelop's Chemical X formulation.  Croda requested that Agform send the samples to its Brazilian laboratory, where a Croda scientist would conduct the tests.  The volumes of Envelop that Croda sought demonstrated its interest.  For context, about 100 milliliters of finished Envelop

RLF1 33264597v.1

product would be needed to spray an entire plot in a field.  Yet Croda sought five times that amount, or 500 milliliters of finished product, plus the raw materials to make another 500 milliliters.  Agform has since learned that Croda requested these large quantities, on information and belief, to steal and commercialize the technology for itself.

- *Another Meeting and Request for Agform's Product Manual (February 22, 2024)*— During this meeting, Croda requested that Agform send a detailed technical product manual for Envelop to show the proper process for combining raw ingredients to produce finished product.  Agform obliged.  On information and belief, Croda sought Agform's Envelop product manual so that it could take further steps to commercialize the technology on its own.

- *Suggesting the Need for Potential Commercial Permits from Brazilian Authorities (February 28, 2024)*—Croda told Agform that the Croda's Brazilian scientist receiving the samples would need to seek a "Special Temporary Registration for Research and Experimentation" in Brazil—for short, an "RET Permit" (Registro Especial Temporario, in Portuguese).  Croda made this requirement seem benign at the time, linking it to the need for importation and basic lab tests, like those contemplated under its Work Plan.  But the true scope of RET Permits is much broader.  On information and belief, Croda sought RET Permits from Brazilian authorities so that it could conduct field testing and other steps necessary to commercialize the technology on its own.

33.     Croda sought Agform's Trade Secrets in the ways identified above with the protections that Agform had put in place, alongside the understanding that Croda would keep this

information confidential and use it only in ways contemplated by Agform.

**D.**  **Croda Continues To Solicit Agform's Trade Secrets Under The Guise Of A Potential Partnership.**

34.    Agform continued to disclose Trade Secrets to Croda through March 2024, by this time with even further bases for the understanding that Croda would not misuse them (again, however, Agform cannot disclose those protections in this public pleading due to confidentiality restrictions attendant to these protections).  As contemplated in the Work Plan, Croda was to conduct tests on Envelop and give Agform the results.  Agform and Croda contemplated an option for Croda to gain exclusive licensing rights to the technology, including for licensing in the United States.

35.    Croda continued to request, and Agform continued to send, additional samples and raw materials.  Agform also provided the product manual that Croda requested.  The 112-page product manual bears the marking "Company Confidential," and describes, among other things, Agform's production of Envelop, including the details of the formulation and its stability, as well as raw material and finished product specifications.

36.    On March 9, 2024, Croda promised to update Agform on its testing timeline, and set a time for further meetings to review its current findings.  Croda did not provide that updated timeline, so Agform followed up on March 20, 2024.  Croda confirmed it was receiving all necessary samples and again promised a timeline plan.  But even by April 10, 2024, it had provided no such plan or feedback, so Agform again followed up.  Croda replied that the initial studies were progressing with the pre-formulated samples, but it blamed Brazilian customs for holding up delivery of individual component samples for testing.  Croda once again promised to share a target date for initial feedback.

37.     This target date never came, so Agform continued to follow up, including by requesting an update on April 10, 2024.  Instead of providing a substantive update on testing, Croda requested yet more samples.  Agform sent them and again asked to be kept updated on Croda's greenhouse trials.

**E.  Croda Evades Requests For Testing Data And Timelines—While Its Lead Scientist Departs For An Agform Competitor.**

38.     Croda continued to dodge Agform's questions and failed to stick to promised timelines.  By early May 2024, Agform was still asking for and not receiving results and feedback from Croda's greenhouse trials.  When Croda finally responded regarding the greenhouse trials, it said (contrary to Agform's earlier feedback for moving these trials from "stage two" to "stage one" in the Work Plan) that it was not planning on doing those tests.

39.     Instead, on May 21, 2024, Croda explained that its lead Brazilian scientist on the Envelop testing was leaving to join Syngenta, an agrochemical company competitive to Agform. Concerned about the project, and about its Trade Secrets seeping to a competitor through Croda's now-departed Brazilian scientist, Agform arranged a meeting for early June 2024.  Ahead of that meeting, Agform requested that Croda share any interim data on the samples it provided Croda nearly three months prior.  Croda did not do so.  During that June 13, 2024 meeting, Agform restated its expectation of receiving Croda's timetable for the completing its work.

40.     By July, Croda had still not provided a timetable or testing data, but it continued to string Agform along.  On July 19, 2024, Croda promised Agform feedback the following week. Once again, Croda did not follow through, so Agform, once again, followed up ten days later. Croda promised an update "in the next day or so."  That update did not come.

41.     By August 2024—over six months after receiving samples pursuant to a Work Plan that contemplated completed testing in five months—Croda had *still* not provided a timetable or

testing data. Agform continued to follow up. At long last, Croda finally claimed it completed *something*, but it was far short of what the Work Plan contemplated. Croda indicated that it had performed basic physio-chemical testing, but not biodegradability or greenhouse tests.

42. With Agform's frustrations mounting in mid-September 2024, and with Agform's growing need to pursue alternative avenues for commercializing Envelop, Croda apologized for its lack of feedback on Envelop and acknowledged that it had not shared anything based on the tests it had completed. On information and belief, Croda did not share test results that it previously represented it would share, and dodged follow-ups and requests for information from Agform, to conceal its attempts to commercialize the technology on its own.

**F. Croda Reveals Incomplete Test Results, Increasing Suspicions Of Its True Misconduct.**

43. In November 2024, Agform demanded the results from Croda's proof-of-concept evaluation of Envelop. Croda said it would respond, but Agform had to follow up repeatedly through February 2025 before Croda finally did. The "results" were alarming.

44. Croda's February 19, 2025 test results of Envelop—a product on which it was actively testing for more than half a year—summarized Croda's minimal progress. Rather than reflecting the results contemplated in the Work Plan (an estimated five months' worth of work on physio-chemical, biodegradability, and greenhouse testing), Croda's report showed results from only modest physio-chemical testing. While Agform expected Croda to conduct some of these tests, they were not central to Croda's analysis. Nor were they central to Agform's reasons for sharing its Trade Secrets. And in any event, these tests should not have taken the many months that Croda spent; instead, to conduct the testing reflected in Croda's February 2025 report would be a matter of days, not months.

45.    Croda acknowledged that its work had not progressed beyond merely replicating Agform's own studies, raising the question (which Croda has not answered) of what Croda was doing all this time.  The answer, on information and belief, is that Croda was misappropriating Agform's trade secrets by, for example, conducting unauthorized tests and development efforts geared at commercializing the technology on its own rather than performing the tests that Agform permitted when it disclosed its Trade Secrets.

46.    Just as alarming was the metadata on Croda's February 2025 report.  The report's "Author" appeared to be a Croda scientist, who was not contemplated on Croda's Work Plan nor ever involved in discussions with Agform.  Instead, that Croda scientist works in Croda's Skin, Sun, and Colour Cosmetics division—separate from the agrochemical space for which Agform permitted Croda to assess Envelop.  Nevertheless, as a product designed for the delivery of active ingredients in a biodegradable, microplastic-free chemical encasement, Envelop could be further developed for use in skin and sun care products (like sunscreens).  On information and belief, Croda misused Agform's Trade Secrets to explore the development of other products using Envelop's technology.

## G. Meanwhile, Three Of Agform's Promising Envelop Partnerships Simultaneously Fall Through.

47.    In the backdrop of its development efforts with Croda, Agform solicited interest from other key strategic partners, including the manufacturers of active ingredients with strong strategic use cases for Envelop.  After initially showing great interest, these three partners ceased discussions with Agform—all around the same time.  That timing aligns with the time period during which Croda revealed its February 2025 "results" to Agform.  That timing also aligns with the season during which Brazilian soy farmers begin to harvest their crop—a concerning timeline given that Croda's Envelop "testing" occurred in Brazil and surrounded the use of Chemical X, an

integral agent in soy farming that must be applied during this planting season.  Indeed, Croda had telegraphed its desire to pursue an RET Permit from Brazilian authorities.  This RET Permit would have allowed it to demo an Envelop knock-off to potential partners and customers in field testing.

48.    In short, the facts align to reveal Croda's misconduct, including that, on information and belief:  Croda knew Agform's Envelop technology and know-how for creating it, including for the delivery of Chemical X; Croda knew Agform's strategies for commercializing it, including the identities of the partners identified below and plans for engaging with them; Croda housed its samples of Envelop and Chemical X in Brazil, where it conducted numerous tests on them; Croda planned to seek an Brazilian RET Permit that would have allowed it to showcase a derivative Envelop product in field testing; that field testing would have involved the use of Chemical X on soy crops; harvesting those crops (and just prior to this, the attendant biological evaluation and demonstration of the utility of the Envelop samples provided by Agform) in Brazil would have occurred around the time that three of Agform's potential partners (described below) ceased discussions about Envelop with Agform.

49.    In furtherance of its attempts to commercialize the technology on its own, Croda, on information and belief, disclosed Agform's Trade Secrets in Envelop to the partners discussed below, including through field testing demonstrations (allowable under an RET Permit) of a knock-off Envelop product during the Brazilian soy planting season.

i.    *"Partner A"*

50.    Partner A is one of the world's premier manufacturers of Chemical X.  Agform first approached Partner A regarding Envelop in February 2024.  Discussions picked up a year later, when Partner A set a meeting with Agform to discuss Envelop.  Partner A said it "could see global

use for this" and "is very much looking forward to understanding your new Envelop technology and how we can work together."

51.    At a March 13, 2025 meeting, Agform presented Envelop to Partner A and discussed potential partnership; Partner A thanked Agform "for the good presentation and discussion" and indicated it would "have an internal debriefing call tomorrow to discuss our interest and path forward."  Partner A then terminated its interest in Envelop abruptly.  On information and belief, Partner A did so because Croda disclosed Agform's Envelop Trade Secrets to Partner A in the manner described above in Croda's effort to engage with Partner A directly on the technology and exclude Agform from those discussions.

　　　ii.    *"Partner B"*

52.    Partner B is another premier manufacturer of Chemical X.  Croda has admitted it has a commercial relationship with Partner B.

53.    Agform approached Partner B regarding Envelop in December 2024.  Partner B, expressing "interest[] in hearing about this new technology," set a May 7, 2025 meeting with Agform.

54.    Partner B cancelled the meeting and, just like Partner A, ceased its discussions with Agform about Envelop in March 2025.  On information and belief, Partner B cancelled its meeting with Agform and ceased discussions regarding Envelop because Croda disclosed Agform's Envelop Trade Secrets to Partner B through a field testing demo to a Partner B's scientist in Croda's effort to pitch the technology directly to Partner B while excluding Agform from those discussions.

55.    After this cancellation, Agform reached out to a personal and business connection at Partner B.  The connection's responses were cagey.  He acknowledged Partner B's consideration

of Envelop but denied any knowledge of the details.  He noted a need to clarify the confidentiality "rights and obligations of all parties," without specifying who those parties were—Agform, Partner B, and/or Croda.

       iii.    *"Partner C"*

56.    Partner C is one of the only manufacturers of another key active ingredient that, as Agform had disclosed to Croda, may be utilized with the Envelop platform.  Agform and Partner C began discussing Envelop in April 2025.  But these discussions followed the same pattern— initial interest, then abrupt ending.  Despite setting a meeting and discussing Envelop's patentability in detail, Partner C also ended discussions with Agform regarding Envelop around the same time as Partners A and B, suggesting, on information and belief, that Croda pitched Envelop (or a derivative technology) directly to Partner C while excluding Agform from those discussions.

## H.  Croda Dodges Questions About Its Conduct And Refuses To Provide Basic Assurances.

57.    As evidence of Croda's misconduct mounted, Agform sought to get to the bottom of it through informal, pre-suit discussions.  Croda's responses have ranged from false denials to obfuscation to indignity.

58.    On March 31, 2025, Agform sought from Croda the simple assurance that Croda had not disclosed any of its confidential information to third parties and had not used the same to create an Envelop copycat product.  Croda's April 10, 2025 denials amounted to asking Agform to take Croda's word for it.  When Agform insisted that Croda provided written, binding assurances, Croda refused.  In further correspondence, Agform pressed Croda about potential improper disclosures to Partner B; sidestepping the question, Croda again refused.

59.     Intent on finding answers, Agform's managing director had a call with Croda's global general counsel on May 16, 2025.  Croda did not relent in its conclusory denials, nor did it provide any credible explanations for its conduct.  Instead, Croda's general counsel, when confronted with the actual and circumstantial evidence of misappropriation, responded:  "So what?"

60.     With Croda making clear that further informal discussions would be futile, and with no other choice, Agform brings this action for misappropriation of its trade secrets against Croda.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Misappropriation Under and Violation of the DTSA
18 U.S.C. § 1836, *et seq.*
Against All Defendants**

61.     Agform incorporates and re-alleges each and every allegation above as if fully set forth herein.

62.     Agform is the owner of Trade Secrets, as defined above and incorporated herein. These Trade Secrets relate to Agform's Envelop product, including its formula, processes for mixing, valuation, and strategic measures for bringing it to market.

63.     Agform has taken reasonable and extensive measures to keep secret the Trade Secrets.  These measures are described above and incorporated herein and include, for example, disclosing the Trade Secrets on a need-to-know basis internally and externally (and requiring assurances of non-disclosure before any external disclosures), password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, and training employees on these rules.  Due to these security

measures, the Trade Secrets are not available for others in the agricultural industry—or in any other industry—to use through any legitimate means.

64.     Agform's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information in the ways described above and incorporated herein.

65.     At no time did Agform consent to Croda taking, using, retaining, or disclosing the Trade Secrets for the purposes of disclosing them to any third parties, including Partners A, B, and C, or for independently developing any products competitive to or derived from Agform's Envelop technology.

66.     In violation of Agform's rights, Croda misappropriated the Trade Secrets within the meaning of the DTSA, 18 U.S.C. § 1836, in the improper and unlawful manners as alleged above and incorporated herein, including by acquiring, retaining, and using Agform's trade secret information.

67.     On information and belief, Croda misappropriated the Trade Secrets in the ways described above and incorporated here, including by (a) on information and belief, misappropriating Agform's Trade Secrets in its Envelop technology in an improper attempt to develop a competing product, including by using technological and business strategies proprietary to Agform, and (b) on information and belief, disclosing Agform's Trade Secrets in its Envelop technology to Agform's actual and potential business partners and customers, including at least Partners A, B, and/or C, in an improper attempt to commercialize and bring to market a competing product.

RLF1 33264597v.1

68.    Croda's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.  On information and belief, it knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

69.    As a direct result of Croda's conduct, Agform has suffered harm and significant damages within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I), in an amount to be proven at trial. In addition, Croda has been unjustly enriched because of its misappropriation of the Trade Secrets within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(II), in an amount to be proven at trial.

70.    Because Agform's remedy at law is inadequate, Agform seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets.  Agform's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION

### Misappropriation Under and Violation of the DUTSA
### 6 Del. C. § 2001, *et seq.*

### Against All Defendants

71.    Agform incorporates and re-alleges each and every allegation above as if fully set forth herein.

72.    Agform is the owner of Trade Secrets, as defined above and incorporated herein. These Trade Secrets relate to Agform's Envelop product, including its formula, processes for mixing, valuation, and strategic measures for bringing it to market.  These Trade Secrets constitute trade secrets under Delaware law and the DUTSA.

73.    Agform has taken reasonable and extensive measures to keep secret the Trade Secrets.  These measures are described above and incorporated herein and include, for example, disclosing the Trade Secrets on a need-to-know basis internally and externally (and requiring

assurances of non-disclosure before any external disclosures), password protecting computers, applying other network protections to prevent unauthorized external access, including firewalls, encryption, and cyber security software, requiring employees to abide by confidentiality rules and an employee code of conduct, and training employees on these rules.  Due to these security measures, the Trade Secrets are not available for others in the agricultural industry—or in any other industry—to use through any legitimate means.

74.    Agform's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information in the ways described above and incorporated herein.

75.    At no time did Agform consent to Croda taking, using, retaining, or disclosing the Trade Secrets for the purposes of disclosing them to any third parties, including Partners A, B, and C, or for independently developing any products competitive to or derived from Agform's Envelop technology.

76.    In violation of Agform's rights, Croda misappropriated the Trade Secrets within the meaning of the DUTSA, in the improper and unlawful manners as alleged herein, including by acquiring, retaining, and using Agform's trade secret information.

77.    Croda misappropriated the Trade Secrets in the ways described above and incorporated here, including by (a) on information and belief, misappropriating Agform's Trade Secrets in its Envelop technology in an improper attempt to develop a competing product, including by using technological and business strategies proprietary to Agform for doing so, and (b) on information and belief, disclosing Agform's Trade Secrets in its Envelop technology to

Agform's actual and potential business partners and customers, including at least Partners A, B, and/or C, in an improper attempt to commercialize and bring to market a competing product

78.    Croda's ongoing misappropriation of the Trade Secrets is intentional, knowing, willful, malicious, fraudulent, and oppressive.  On information and belief, it knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

79.    As a direct result of Croda's conduct, Agform has suffered harm and significant damages within the meaning of the DUTSA, in an amount to be proven at trial.  In addition, Croda has been unjustly enriched because of its misappropriation of the Trade Secrets within the meaning of the DUTSA, in an amount to be proven at trial.

80.    Because Agform's remedy at law is inadequate, Agform seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets within the meaning of the DUTSA.  Agform's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## DEMAND FOR JURY TRIAL

81.    Agform demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Agform prays for a judgment against Croda as follows:

a.    A judgment in favor of Agform and against Croda;

b.    An award of damages caused by Croda's conduct, including compensatory damages, unjust enrichment, punitive, and exemplary damages, as well as applicable interest;

c.    Preliminary and permanent injunctions enjoining Croda, as well as its agents, employees, and all persons acting in concert with it, from using, copying, publishing, disclosing, transferring, or selling Agform's Trade Secrets or other confidential or proprietary information, or

any product that is based on or incorporates part or all of Agform's Trade Secrets or other confidential and proprietary information, and from obtaining any commercial advantage or unjust enrichment from its misappropriation of Agform's Trade Secrets or other confidential or proprietary information;

       d.      A declaration that Croda has no rights or privileges to use Agform's Trade Secrets;

       e.      An order requiring Croda, as well as its, agents, employees, and all persons acting in concert with it, to return to Agform any and all of Agform's Trade Secrets or other confidential or proprietary information that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing Agform's Trade Secrets or other confidential information;

       f.      The imposition of a constructive trust for the benefit of Agform upon: (i) all Agform trade secrets misappropriated by Croda; and (ii) all gains, including, but not limited to, any profits of, equity interests in, and/or increases in the value of equity interests in, Croda from any misappropriation of Agform's Trade Secrets or other confidential or proprietary information by Croda;

       g.      An award of reasonable attorney's fees, costs, and expenses incurred pursuant to the DTSA and DUTSA;

       h.      All pre-judgment and post-judgment interest; and

       i.      Such other relief as the Court may deem proper.

OF COUNSEL:

O'MELVENY & MYERS LLP

David S. Almeling
dalmeling@omm.com
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
(415) 984-8700

Patrick V. Plassio
pplassio@omm.com
2801 North Harwood Street, Suite 1600
Dallas, TX 75201-2692
(972) 360-1900

Hailey S. Verano
hverano@omm.com
Amy Zhao
amyzhao@omm.com
1301 Avenue of the Americas, Suite 1700
New York, New York 10019-6022
(212) 326-2000

Dated:  July 10, 2025

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Plaintiffs Agform Technologies
Limited, Agform Limited, Delsys Technology
Limited, and Agform LLC*

RLF1 33264597v.1